UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DEJUAN WARD. | No. 3:17-CR-171 (MPS) |

**RULING ON MOTION TO SUPPRESS STATEMENTS**

**I.     Introduction**

On August 3, 2017, following an investigation into several shootings in New Haven throughout 2016, a grand jury returned a multi-count indictment charging six individuals with various offenses, including RICO conspiracy, violent crimes in aid of racketeering ("VCAR"), offenses related to possession, transfer, and use of firearms, and possession with intent to distribute narcotics. (ECF No. 1.) One of the defendants, DeJuan Ward, is charged with, among other counts, VCAR assault with a dangerous weapon and VCAR attempted murder, in violation of 18 U.S.C. §§ 1959(a)(3) and (a)(5), and using a firearm during and in relation to a crime of violence, in violation 18 U.S.C. §§ 924(c)(1)(A) and 2.

Ward now moves to suppress any statements he made during a custodial interview that took place on January 6, 2017. He also requests an evidentiary hearing on the motion. (ECF No. 153.)   Ward argues that law enforcement failed to adequately apprise him of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1996), and that, to the extent he was informed of his *Miranda* rights, he did not fully understand them or the significance of waiving those rights. Ward also argues that he never voluntarily waived his rights, and that he asserted his constitutional right to remain silent multiple times during the interview, but that the agents ignored his requests.

I find that (1) the video recording of Ward's interview is sufficient to determine whether he was informed of his rights under *Miranda* and knowingly and voluntarily waived those rights

1

without an evidentiary hearing; (2) the video shows that Ward was properly apprised of his rights and that he waived them knowingly and voluntarily; and (3) although the Government's representation that it will not use any of Ward's statements after he asserted his right to end the interview likely moots the remainder of his motion, I will nonetheless grant that portion of his motion seeking to suppress statements he made after he asserted his right to end the interview.

I therefore DENY Ward's request for an evidentiary hearing and GRANT IN PART AND DENY IN PART his motion to suppress.

## II. Factual Background

Defendant DeJaun Ward was arrested on January 6, 2017 on a complaint for possession of a firearm with an obliterated serial number. Law enforcement officials from the Bureau of Alcohol, Tobacco, and Firearms ("ATF") interviewed Ward at around 6:00 PM that day. The Court reviewed a video recording and transcript of the interview, the relevant portions of which are described below.

The video begins with one individual, identified as "Special Agent" in the transcript, announcing the time and date, and indicating that the video will show "an ATF interview with De[J]uan Ward." (Transcript 1 at 1.) After roughly four minutes, two agents bring Ward into the interview room where he sits alone until they return six minutes later. (Transcript 1 at 1; Video 1 at 9:54.) The agents are identified in the transcript as "Special Agent 3" and "Special Agent 4." *Id.* They give Ward a soda and a pack of cigarettes with a lighter before unlocking his handcuffs. (Transcript 1 at 2; Video 1 at 12:45.)

Special Agent 3 ("the agent") conducts the relevant portions of the interview. He begins by asking Ward his name, his date of birth, whether he knows where he is, and that day's date. (Transcript 1 at 4-6; Video 1 at 13:23-14:44.) Ward provides this information and confirms he

knows where he is. (Transcript 1 at 6.) The agent asks about Ward's educational background, and Ward indicates that he received a high school diploma. (Transcript 1 at 7; Video 1 at 15:07-15:34.) Ward confirms that he can read, write, and understand English. (Transcript 1 at 8; Video 1 at 15:35-15:49.) The agent asks whether Ward has "a clear mind," knows where he is, and whether he is high or drunk. (Transcript 1 at 9; Video 1 at 16:13-16:15.) Ward admits that he had been drinking "a little bit," but agrees that he is "not fucked up," and that he knows where he is. (Transcript 1 at 9-10; 16:16-16:20.) The agent asks two more times whether Ward is "clear minded," and Ward replies that he is. (Transcript 1 at 10; Video 1 at 16:24-16:26.)

The agent then tells Ward he is going to read him his *Miranda* rights and takes out a form. He asks if Ward has ever gone over such a form with police officers previously and been advised of his *Miranda* rights before. (Transcript at 10-11; Video at 16:37-16:40.) Ward replies "yeah" to both questions. (*Id.*). The agent asks Ward to sit "[a] little closer, so you can read that . . . . I have to advise you of your rights." (Transcript 1 at 11; Video 1 at 16:48-16:50.) He asks Ward to read the first line "out loud," and Ward shouts, "I have been advised and I understand that—" causing the two agents to laugh. (Transcript 1 at 11; Video 1 at 16:52.) The agent asks, "Why are you screaming?" and Ward responds calmly, "You said out loud, bro." (Transcript 1 at 11; Video 1 at 16:59-170:01.) The agent then takes over reading the form. He points to each line as he reads:

| | |
|---|---|
| Special Agent 3: | You have the right to remain silent. Do you understand that? |
| Ward: | Mhm. |
| Special Agent 3: | Anything you say can be used in a court of law. Do you understand that? |
| Ward: | Yep. |
| Special Agent 3: | You have the right to talk to a lawyer before you answer the questions, and to have a lawyer during further questioning. |

3

| | |
|---|---|
| Ward: | Yep. |
| Special Agent 3: | Do you understand that? You have the right to have a lawyer [U/I].[1] If you can't afford one—to answer any questions. If you have any questions, you have the right to stop answering anytime for any reason. Do you understand all that? |
| Ward: | Yep. |
| Special Agent 3: | All right. You may stop answering questions anytime. Talk to a lawyer, have a lawyer with you during further questions. Do you understand that? |
| Ward: | Yep. |
| Special Agent 3: | All right. |
| [Special Agent 3]:[2] | Do you understand everything? |
| [Ward]: | Yeah. |
| [Special Agent 3]: | All right. Can you initial here? |

(Transcript 1 at 11-12; Video 1 at 17:08-17:31.)

Once the agent finishes reading, he passes the form to Ward to initial. The video shows Ward initialing the form (Video 1 at 17:39-17:52), and the completed form shows Ward's initials next to each of the following:

- I HAVE THE RIGHT TO REMAIN SILENT.
- ANYTHING I SAY CAN AND WILL BE USED AGAINST ME IN A COURT OF LAW
- I HAVE THE RIGHT TO CONSULT WITH A LAWYER BEFORE I ANSWER ANY QUESTIONS AND I MAY HAVE A LAWYER WITH ME DURING ANY QUESTIONS.
- I HAVE THE RIGHT TO HAVE A LAWYER APPOINTED FOR ME IF I CAN NOT AFFORD ONE BEFORE I ANSWER ANY QUESTIONS.

---

[1] [U/I] in the transcript indicates "Unidentified, Unintelligible diction." (Transcript 1 at 1.)
[2] The transcript reverses statements made by Special Agent 3 and Ward at this point, but the correct speakers are clear from the video. (Transcript 1 at 12; Video 1 at 17:17-17:23.) The error in transcription appears to resolve by the end of the same page. (Transcript 1 at 12.)

- IF I ANSWER ANY QUESTIONS, I HAVE THE RIGHT TO STOP ANSWERING AT ANY TIME FOR ANY REASON.
- I MAY STOP ANSWERING QUESTIONS AT ANY TIME TO TALK TO A LAWYER AND HAVE A LAWYER WITH ME DURING FURTHER QUESTIONING.

(ECF No. 164-1 at 2.) The video also shows Ward signing the waiver form. (Video 1 at 17:57-17:59.) The form shows his signature under a paragraph titled "WAIVER" reading

> I FULLY UNDERSTAND THESE RIGHTS. I AM WILLING TO ANSWER QUESTIONS. I DO NOT WANT A LAWYER AT THIS TIME. I AM WAIVING THESE RIGHTS FREELY AND VOLUNTARILY WITHOUT ANY PROMISES OR THREATS BEING MADE TO ME.

(ECF No. 164-1 at 2.) The video shows both agents signing the form as witnesses. (Video 1 at 18:27-18:50; ECF No. 164-1 at 2.)

The agents then begin questioning Ward, asking "What's up?" (Transcript 1 at 15; Video 1 at 19:00.) Ward asks "What gun am I being charged with?" (*Id.*) The questioning continues for approximately 30 minutes, at which point the following exchange occurs:

| | |
|---|---|
| Ward: | I'm done talking, man. I don't give a fuck, man. Bring me to my cell, man. Don't about—ya'll niggas don't give a fuck, man. [Sighs] [Extended pause] |
| Special Agent 4: | [Addresses Special Agent 3] You want to give him a minute? |
| Ward: | Nah, man. Just bring me to my cell. I'm done talking. |

(Transcript 1 at 52; Video 1 at 48:52.) A knock is heard at the door, and both agents leave the room. (Video 1 at 49:14.) Ward is left alone for the next three minutes until two different agents enter the room, identified in the transcript as "Special Agent" and "Special Agent 5." (Video 1 at 53:54.) They introduce themselves as "the B-Team" (Transcript 1 at 54:04), and continue questioning Ward.

On two more occasions, Ward makes statements suggesting he wants to end the interview. First, he states "I don't want to answer any questions, man." (Transcript 2 at 10; Video 2 at 8:32.) The questioning nevertheless continues. Later, he asks "Can I go to my cell now?" (Transcript 2 at 50; Video 2 at 49:18.) The agents tell him to "hang out, just for one second," but soon continue questioning him and continue the interview for another hour. When the interview ultimately ends, the video shows a time of 9:27 PM—three hours and twenty-six minutes after the recording began. (Video 3 at 1:47.)

### III. Discussion

Ward argues that his statements to law enforcement must be excluded for three reasons. First, he claims he did not effectively waive his rights under *Miranda* because one agent misspoke in reading those rights to him. (ECF No. 153-1 at 1.) Second, he argues that the video does not show that his responses in the interview were the product of "a knowing, voluntary and intelligent waiver" of his rights, so the Government has not met its burden to prove voluntariness under *North Carolina v. Butler*. (ECF No. 153-1 at 1.) (citing *North Carolina v. Butler*, 441 U.S. 369 (1979). Third, he claims that all of the responses he gave should be suppressed because agents deliberately continued to question him even after he unequivocally invoked his right to remain silent. (ECF No. 153-1 at 1.) I first consider whether, as Ward contends, an evidentiary hearing is necessary to address his arguments.

#### A. Evidentiary Hearing

Ward argues that the Court cannot determine whether he voluntarily waived his rights under *Miranda* "merely [by] watching the video exhibits," and asserts a constitutional and statutory right to a hearing to determine whether his statements were voluntary. (ECF No. 153-1 at 15). A defendant's statements may not be presented to a jury "until the trial judge has

determined that [they were] freely given." *Sims v. Georgia*, 385 U.S. 538, 543-55 (1967). But an evidentiary hearing is not required when the facts underlying the defendant's challenge have already been presented to the court. *United States v. Kaba*, 999 F.2d 47, 50 (2d Cir. 1993) ("[A] separate hearing [on voluntariness] is only necessary when there is additional evidence for the court to consider. . . . Here, [the defendant] expressly based his objection on facts that already had been presented to the Court").[3]

Ward's argument that an evidentiary hearing is required in this case is contrary to Second Circuit precedent. While a defendant challenging the voluntariness of statements made in a custodial interrogation has the right to "a fair hearing and a reliable determination on the issue of voluntariness," *Jackson v. Denno*, 378 U.S. 368, 377 (1964), that right is only triggered when "the moving papers are sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that contested issues of fact . . . are in question." *United States v. Harris*, 548 F. App'x 679, 681 (2d Cir. 2013) (quoting *In re Terrorist Bombins of U.S. Embassies in E. Africa*, 552 F.3d 157, 165 (2d Cir. 2008)) (alteration in original).

Ward's "moving papers" do not suggest that there is any "additional evidence for the court to consider" before determining whether his statements were voluntary. *See Kaba*, 999 F.2d at 50. Ward does not attach an affidavit or other evidentiary material to his motion. Further, he relies exclusively on the video recording and transcript of his interview with law enforcement

---

[3] Ward quotes dicta from *Pinto v. Pierce*, 389 U.S. 31, 32 (1967) (per curiam) noting that "*Jackson v. Denno* . . . held that a defendant's constitutional rights are violated when his challenged confession is introduced without a determination by the trial judge of its voluntariness after an adequate hearing." The issue in that case was whether it was improper for a judge to hold a hearing on voluntariness in the presence of the jury, not whether a hearing was always required in the first instance. In *Denno*, the Court explicitly acknowledged that no hearing would be necessary "where the facts concerning the circumstances surrounding the confession are undisputed and the task is only to judge the voluntariness of the confession based upon the clearly established facts and in accordance with proper constitutional standards." *Denno*, 378 U.S. 368, 391 (1964).

7

to support his assertions. (*Id.* at 1-2.)[4] Ward does not contend that the video is inaccurate or incomplete or that there were portions of the interview that were not videotaped. Nor does he contest the accuracy of the transcript prepared by the Government. (ECF No. 153-1 at 1) ("[W]e consider the transcripts sufficiently accurate to rely on them to portray the events that occurred in the interrogation room."). The Government similarly relies on the video and transcript in arguing against suppression. (ECF No. 164 at 2) ("There are no allegations that anything of relevance occurred before this videotape began or that anything was hidden from the camera.").

I must decide whether Ward had an opportunity to, and whether he actually did, read the *Miranda* waiver form. *See, e.g.*, *United States v. Alcantara*, No. 09 CR 231 (NRB), 2009 WL 4756491, at *10 (S.D.N.Y. Dec. 2, 2009) (declining to suppress statements a defendant made to law enforcement in light of evidence that the defendant read and understood a written Miranda waiver). The video provides a sufficient basis to answer these questions. *See United States v. Hao Zhang*, No. 5:15-CR-00106-EJD, 2018 WL 809448, at *1 n. 1 (N.D. Cal. Feb. 9, 2018) (noting that no hearing was required to determine voluntariness of a *Miranda* waiver where the interview was videotaped); *United States v. Johnson*, No. 1:15:CR:90-01, 2015 WL 8207328, at *1 (W.D. Mich. Dec. 7, 2015) (same).While Ward and the Government disagree in their characterizations of the interview, neither contends that the video does not accurately capture what happened. For example, Ward asserts that "it does not appear from the video that any time was given [for Ward] to read [the *Miranda* waiver form] for himself." (ECF No. 153-1 at 3. For its part, the Government contends that the video shows Ward "looking at the form and reviewing it as TFO Sanchez asks him questions," and that "[t]he Waiver Form . . . stays in front of Ward

---

[4] Ward also makes three references to "ATF Report No. 57" but offers no specific citation to the report in the record and has not provided the Court with a copy of the report. (ECF No. 153-1 at 2, 3, 13.)  I find that these references do not raise any questions of fact that would alter the disposition of this motion or that call the accuracy of the video and transcript into doubt. I do not rely on the report here.

8

for over a minute and half." (ECF No. 164 at 3-4.) If being "given" the form to read for himself means placing the form in his hands and ceasing conversation while he reads it silently, then my review of the video confirms that Ward's characterization is accurate. My review also confirms the accuracy of the Government's statement that Ward is looking at the form while one of the agents asks him questions about it and that it remains in front of him for 90 seconds or so. In other words, these different characterizations of what is shown in the video do not reflect disagreements about the facts themselves or suggest that the video is inaccurate or incomplete. Ward does not point to any evidence outside the video that would shed further light on what happened inside the interview room or otherwise assist me in reconciling his characterization of the video with that of the government.

To the extent that Ward's counsel's motion and brief seek to raise factual disputes, they are insufficient to show that an evidentiary hearing is required. An attorney's statements in support of a motion cannot, on their own, create a genuine issue of fact. *See United States v. Mottley*, 130 F. App'x 508, 510 (2d Cir. 2005) ("The statements offered on the matter by Mottley's attorney in the reply brief before the district court likewise did not create an issue of fact." (citing *United States v. Gillette*, 383 F.2d 843, 848-49 (2d Cir. 1967))). Ward has not raised genuine disputes of fact requiring a hearing. I find that the video evidence and transcript are sufficient to resolve any discrepancies in characterization between Ward's account and the Government's, and I resolve those discrepancies below. Ward's request for an evidentiary hearing is therefore denied.

### B. Voluntariness of *Miranda* Waiver

It is well settled that when an individual is questioned in police custody, "[h]e must be warned prior to any questioning that he has the right to remain silent, that anything he says can

9

be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). "[C]ourts must presume that a defendant did not waive his [*Miranda*] rights." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979). Therefore, to establish that a defendant validly waived his *Miranda* rights, the Government must prove by a preponderance of the evidence "(1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the right being waived and of the consequences of waiving the right." *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995). Courts assessing whether a defendant has knowingly and voluntarily waived his *Miranda* rights must consider the totality of the circumstances. *Fare v. Michael C.*, 442 U.S. 707, 724-25 (1979). Ward does not suggest, and I do not find, that his waiver was the "product of . . . intimidation, coercion, or deception." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (internal quotation marks omitted). Indeed, Ward was joking with the officers and casually holding a cigarette at the outset of the interview when his Miranda rights were reviewed with him. His contentions focus instead on whether he understood his rights under *Miranda* and the implication of waiving those rights. I find that, taken together, the video of Ward's interview, the transcript, and the signed and initialed waiver form attached to the Government's brief show that he did.

Ward argues that the agent reviewing the *Miranda* form with him misstated his rights. Thus, he did not understand what he was told and his waiver was not voluntary. (ECF No. 153-1.) Specifically, when one agent, identified as "Special Agent 3" in the transcript, read the *Miranda* waiver form, he incorrectly stated

> You have the right to have a lawyer [U/I]. If you can't afford one—to answer any questions. If you have any questions, you have the right to stop answering anytime for any reason. Do you understand all that?[5]

(Transcript 1 at 12; Video 1 at 17:17-17:23.) I find that Ward's argument is factually incomplete and legally unavailing. While this portion of the transcript, viewed in isolation, appears to suggest that the information the agent provided was erroneous, the entire transcript, video, and waiver form, considered together, paint a different picture. First, the agent's statements before and after his jumbled misstatement convey the correct information that his misstatement should have contained. Before the error, the agent clearly informs Ward that he has the right to remain silent. (Transcript 1 at 11.) After the error, the agent clearly tells Ward that he may "stop answering questions at any time." (Transcript 1 at 12.) Taken together, these statements accurately convey that Ward may refuse to answer questions and may stop answering questions at any time even after he begins. Next, the video shows that the agent had moved the waiver form to the corner of the table, positioned between himself and Ward, before he began reading Ward his rights. (Video 1 at 17:07.) The waiver form lists each item that the agent reads out loud (ECF No. 164-1), and the video shows the agent reading the items quickly and following along the text with his finger. (Video 1 at 17:10.) Although Ward can be seen looking around the room at times, he largely follows along with the agent as he reads. (Video 1 at 17:07-17:29.) The agent speaks fast and mumbles at times. (*Id.*) Still, he points to each line as he reads, and after each line asks, "Do you understand that?" (*Id.*; Transcript 1 at 11-12.) In each case, Ward responds affirmatively. *Id*. Ward thus had an opportunity to read the form along with the agent, and the

---

[5] It appears that this misstatement is a combination of multiple lines on the form. The last three lines actually read (1) "I have the right to have a lawyer appointed for me if I cannot afford one before I answer any questions;" (2) If I answer any questions, I have a right to stop answering at any time for any reason;" and (3) "I may stop answering questions at any time to talk to a lawyer and have a lawyer with me during further questions." (ECF No. 164-1 at 2).

agent ensured that, despite his speaking quickly, Ward understood the form. After he finishes reading, the video shows the agent turning the form to Ward, and Ward can be seen initialing each line. (Video 1 at 17:35.) In this way, Ward had a second opportunity to read the waiver form. Indeed, he indicated he understood the form by initialing it and signing under the following block of text:

> I FULLY UNDERSTAND THESE RIGHTS. I AM WILLING TO ANSWER QUESTIONS. I DO NOT WANT A LAWYER AT THIS TIME. I AM WAIVING THESE RIGHTS FREELY AND VOLUNTARILY WITHOUT ANY PROMISES OR THREATS BEING MADE TO ME.

(ECF No. 164-1 at 2.) Under those circumstances, I find that the evidence shows that Ward understood his rights and was not misled by the agent's fumbling over part of the form.

Even if Ward heard and understood the agent's misstatement, it would not be enough to require suppression of Ward's subsequent statements. "Reviewing courts . . . need not examine *Miranda* warnings as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably convey to a suspect his rights . . . ." *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989). As a result, a "slight variance from the standard *Miranda* warnings will [not] necessarily invalidate a defendant's waiver of his or her *Miranda* rights." *United States v. Murphy*, 703 F.3d 182, 193 (2d Cir. 2012). In *Murphy*, the Second Circuit held that an officer's mistake in apprising a defendant of his rights "cast serious doubt" on whether the defendant's waiver was voluntary. *Id.* at 193. In that case, however, the officer's mistake implied that the defendant "would waive [his] rights if [he] remained silent." *Id.* Specifically, the officer told the defendant that he could "decide at any time to give up [his] rights, and not talk to us." *Id.* at 187. The statement therefore suggested the opposite of the warning that *Miranda*

requires, i.e., that a suspect's exercising his Fifth Amendment rights would entail speaking with officers. *Id.* When the defendant in *Murphy* indicated that he understood, then, it showed only that he understood the officer's statement, not that he understood his rights under *Miranda*. *Id.*

The agent's misstatement in this case is not analogous to *Murphy*. The transcript indicates that the agent told Ward, "If you have any questions, you have the right to stop answering anytime for any reason." (Transcript 1 at 12.) Ward argues that this incorrect warning made it seem as if he could stop the interrogation only if he had questions. (ECF No. 153-1 at 7.) Comparing the transcript to the Waiver Form, I find that the agent should have said, "If [you] answer any questions, [you] have the right to stop answering at any time for any reason." (ECF No. 164-1 at 2). The agent can be seen pointing at that location on the form when he makes the error (Video 1 at 17:21), and Ward subsequently initialed next to that line, indicating he understood his rights, (ECF No. 164-1 at 2). Finally, Ward's admitted previous experience reviewing *Miranda* warnings with the police and his statement 30 minutes into the interview, "I'm done talking . . . . Bring me back to my cell, . . ." (Transcript 1 at 52; Video 1 at 48:52), provides further evidence that he understood his rights—indeed, on this occasion, better than did the agents who later entered the room and started questioning him. In light of the video and the waiver form, I find that the agent's misstatement did not mislead Ward, and does not "cast serious doubt" on the voluntariness of the waiver. *Murphy*, 703 F.3d at 193. The evidence here shows that the defendant understood his rights and waived them voluntarily.

### C. Assertion of Right to Terminate Interrogation

The Government represents that it will not use at trial statements made by Ward after he asserted his right to terminate the interrogation. (ECF No. 164 at 1.) This representation likely

moots Ward's request for suppression of those statements occurring after that point, but I will nonetheless grant that request.

Ward nonetheless contends that the agents' conduct in failing to terminate the interrogation after Ward said "I'm done talking" so blatantly violated his rights that the Court should suppress all statements obtained from him on January 6, 2017, including those uttered prior to the assertion of the right to end the interview, as a sanction for misconduct. (ECF No. 153-1 at 2.) Ward argues that this was a deliberate Miranda violation—or that an evidentiary hearing is necessary to determine if it was deliberate. But he points to no precedent—and I am aware of none—suggesting that even a deliberate violation of *Miranda* requires suppression of the statements a defendant made *before* the violation occurred. "The remedy for a Miranda violation is the exclusion from evidence of any *ensuing* self-incriminating statements." *Neighbour v. Covert*, 68 F.3d 1508, 1510 (2d Cir. 1995) (emphasis added); *see also United States v. Patane*, 542 U.S. 630, 641–42 (2004) (plurality opinion) ("[P]olice do not violate a suspect's constitutional rights (or the *Miranda* rule) by negligent or even deliberate failures to provide the suspect with the full panoply of warnings prescribed by *Miranda*. Potential violations occur, if at all, only upon the admission of unwarned statements into evidence at trial. And, at that point, the exclusion of unwarned statements is a complete and sufficient remedy for any perceived *Miranda* violation."). To be sure, Ward's allegations that the agents deliberately sought to circumvent his rights after he asserted them are troubling, as they suggest a failure by the police to comply with well-established prophylactic safeguards aimed at protecting constitutional rights. But the government's abandonment of any attempt to introduce the ensuing statements addresses the issues for the purposes of ensuring a fair trial.[6] Ward's statements made

---

[6] Ward's suggestion that these practices are systemic is speculative.

after he invoked his right to end his questioning (Video 1 at 48:52; Transcript 1 at 52) must be suppressed. The statements he made before that time, however, are admissible subject to the Federal Rules of Evidence.

## IV. Conclusion

For the reasons discussed above, Ward's request for an evidentiary hearing is DENIED. His motion to suppress is GRANTED IN PART AND DENIED IN PART.

\* \* \*

Because the Court's schedule has prevented it from issuing this ruling until approximately 5 weeks before jury selection, the court will not consider any failure by Mr. Ward to change his plea (should he decide to do so) fewer than 30 days before jury selection as a factor in the timeliness analysis under U.S.S.G. § 3E1.1(b). *See* App. Note 6 ("The timeliness of the defendant's acceptance of responsibility is . . . context specific.") The Court emphasizes that it provides this notice only to clarify the impression that it may have created by referring to 30 days at the October 10, 2017 status conference. The Court is fully prepared to accord Mr. Ward his constitutional right to a jury trial.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:     Hartford, Connecticut
           September 10, 2018