## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 3:17-CR-171 (MPS) |
| v. | |
| DEJUAN WARD | |

## FINDINGS FOLLOWING *FATICO* HEARING

### I.    INTRODUCTION

On August 3, 2017, following an investigation into several shootings in New Haven, a grand jury returned an indictment charging six individuals with various offenses, including RICO conspiracy, violent crimes in aid of racketeering ("VCAR"), offenses related to possession, transfer, and use of firearms, and possession with intent to distribute narcotics. ECF No. 1. The Indictment identified defendants as members and associates of the gang "Goodrich Street Boys," or "GSB." ECF No. 1 at 1.

Defendant Dejuan Ward appeared before me on October 7, 2019 and entered a plea of guilty to Count One of the Indictment, which charged him with conspiracy to engage in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).[1] The United States Sentencing

---

[1]    Defendant Ward previously appeared before me on October 4, 2018 and entered a plea of guilty to Count One (conspiracy to engage in a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d)) and Count Five (using a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c)(1)(a) and 18 U.S.C. § 2). While preparing to adjudicate a dispute related to the application of the U.S. Sentencing Guidelines to Mr. Ward, I reviewed the transcript from Mr. Ward's October 2018 change-of-plea hearing. Ultimately, I concluded that the facts Mr. Ward admitted during the October 2018 hearing did not amount to a RICO conspiracy for the reasons I set forth in a written opinion issued on June 19, 2019. ECF No. 343. As a result, I vacated his plea as to Count One, ECF No. 335, and entered a plea of Not Guilty on his behalf, ECF No. 337.
    Mr. Ward subsequently moved to withdraw his guilty plea on Count Five on June 28, 2019. ECF No. 355. I granted that motion on July 15, 2019, and a Not Guilty Plea was entered for Mr. Ward as to Count Five. ECF No. 371.

Guidelines (U.S.S.G.) Manual addresses sentencing for racketeering in § 2E1.1(a)(2), and the parties agree that, under this section, "each underlying act of racketeering is treated as a separate count of conviction" for the purposes of sentencing. Plea Agreement, ECF No. 444 at 6. Mr. Ward admitted to three underlying racketeering acts, but the Government reserved its right to argue that two additional racketeering acts should be considered when determining the appropriate sentencing range under the Guidelines. Mr. Ward does not agree that the fourth and fifth racketeering acts should be used in his Guidelines calculation. In his plea agreement, Mr. Ward agreed that "the Court can base its determination [whether to consider the fourth and fifth acts] on the evidence previously presented at *Fatico* hearings and any additional evidence or arguments made at the time of sentencing."[2] ECF No. 444 at 7.

This memorandum sets forth my factual findings based on the January 2, 2019 *Fatico* hearing and the immediate implications of those findings under the Guidelines. It does not set forth a fulsome factual background and it assumes familiarity with Mr. Ward's October 7, 2019 Plea Agreement (ECF No. 444) and colloquy. It also does not set forth a fulsome Guidelines calculation, which I will defer until the United States Probation Office and the parties have expressed their views as to the proper calculation in light of the findings in this ruling. Nor does it apply the factors under 18 U.S.C. § 3553(a), which I will similarly defer until sentencing.

---

[2]     Following Mr. Ward's initial guilty plea in October 2018 (which was subsequently vacated, as discussed above), I held hearings under *United States v. Fatico*, 579 F.2d 707 (2d Cir. 1978) on November 28, 2018 and on January 2, 2019 to resolve factual disputes between the Government, Mr. Ward, and two of Mr. Ward's co-defendants. The factual disputes regarding Mr. Ward were addressed at the January 2, 2019 hearing, so I rely on the testimony and exhibits entered that day.

## II. BACKGROUND

### A. Relevant Legal Standards

In determining a defendant's offense level under the Guidelines, courts take into account "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant . . . ." U.S.S.G. § 1B1.3(a)(1)(A). In addition, in a case involving "jointly undertaken criminal activity," such as this RICO conspiracy case, the calculation of the offense level must also account for "all acts and omissions of others that were (i) within the scope of the jointly undertaken criminal activity, (ii) in furtherance of that criminal activity, and (iii) reasonably foreseeable in connection with that criminal activity." U.S.S.G. § 1B1.3(a)(1)(B).

"The Government bears the burden of proving the facts supporting the application of a Guidelines provision, and it must do so by a preponderance of the evidence." *United States v. Kent*, 821 F.3d 362, 368 (2d Cir. 2016). "The Federal Rules of Evidence do not apply at sentencing proceedings." *United States v. Gushlak*, 728 F.3d 184, 197 n.10 (2d Cir. 2013). Thus, "[i]n resolving any dispute concerning a factor important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *see also United States v. Juwa*, 508 F.3d 694, 701 (2d Cir. 2007) ("[F]actual matters considered as a basis for sentence must have some minimal indicium of reliability beyond mere allegation.") (quotation marks and alterations omitted). The Government may meet its burden with direct evidence, and it may also use circumstantial evidence. *See United States v. Ulbricht*, 858 F.3d 71, 125 (2d Cir. 2017)

**B. Guidelines Disputes**

Under the Guideline for RICO violations, each underlying racketeering act is treated as a separate count of conviction. U.S.S.G. § 2E1.1 Application Note 1. The parties agree that Mr. Ward's relevant conduct under the Guidelines includes three racketeering acts: (1) a narcotics distribution conspiracy, (2) a conspiracy to commit Hobbs Act Robbery, and (3) obstruction of justice related to James Harris in July 2015. Plea Agreement, ECF No. 444 at 5–6. The Government contends that fourth and fifth racketeering acts should be considered in Mr. Ward's Guidelines calculation: (4) the attempted murder of Pharoh Jackson, and (5) obstruction of justice related to James Harris in March 2016. *Id.* at 7.

If the Government proves Mr. Ward's culpability for the shooting of Pharoh Jackson and that the shooting was an attempted murder, the base offense level for that underlying racketeering act would be 27. U.S.S.G. § 2A2.1(a)(2). If the Government proves that the March 2016 conduct directed at James Harris constitutes obstruction of justice and that Mr. Ward is responsible for that conduct, the base offense level for that underlying act would be 14. *Id.* § 2J1.2(a). According to the Government's calculations in the Plea Agreement, ECF No. 444, eight levels would be added to the March 2016 obstruction of justice because the offense involved a threat to cause physical injury, and three more levels would be added because the offense resulted in substantial interference with the administration of justice—*i.e.*, James Harris's refusal to speak to federal law enforcement after he was shot on April 3, 2016. *Id.* §§ 2J1.2(b)(1)(B), 2J1.2(b)(2). The resulting adjusted offense level for the March 2016 obstruction of justice would therefore be 25. Under the Government's calculation, which includes these fourth and fifth racketeering acts, the highest-scoring racketeering act is the attempted murder, which has an offense level of 27. A total of four offense levels would be added to this level, since three of the

4

other underlying acts—the Hobbs Act Robbery, the 2015 obstruction of justice, and the 2016 obstruction of justice—have offense levels within four levels of the attempted murder. *Id.* § 3D1.4(a). Adding four levels to 27 and then subtracting three levels for Mr. Ward's acceptance of responsibility yields a total offense level of 28. With a Criminal History Category of I, Mr. Ward's Guideline range, under the Government's calculation, would be 78–97 months of imprisonment and a fine range of $25,000 to $250,000. U.S.S.G. § 5E1.2(c)(3).

Mr. Ward does not agree that the fourth and fifth acts should be used in his Guidelines calculation. Without including these underlying acts, the parties agree that his total offense level would be 24. With a Criminal History Category of I, Mr. Ward's Guideline range would be 51–63 months of imprisonment and a fine range of $20,000 to $200,000. U.S.S.G. § 5E1.2(c)(3).

## III. DISCUSSION

### A. September 2015 Shooting of Pharoh Jackson

The Indictment charges that Mr. Ward was a member or associate of the "Goodrich Street Boys" ("GSB"), a gang that also constituted an enterprise whose members and associates conspired to participate in its affairs through a pattern of racketeering activity. ECF No. 1 at 6–7. The Indictment also charges Mr. Ward with shooting Pharoh Jackson, "whom he believed to be a rival gang member," in the leg "[o]n or about September 17, 2015," in furtherance of the RICO conspiracy. ECF No. 1 at 7. The Indictment charges, ECF No. 1 at 10, and the Government contends for sentencing purposes, that this shooting constituted attempted murder, which is a type of racketeering activity under RICO, 18 U.S.C. § 1961(1), and should be considered in Mr. Ward's sentencing under U.S.S.G. § 2E1.1.[3] As noted above, in a sentencing for a RICO

---

[3]     Because Mr. Ward has already admitted to at least two racketeering acts, the findings in this ruling are immaterial to his guilt on the RICO conspiracy charge. *See* 18 U.S.C. §§ 1961–62.

conspiracy, courts take into account both the defendant's own conduct and the conduct of a defendant's co-conspirators that is attributable to the defendant for sentencing purposes, namely, the co-conspirators' acts or omissions that were:

      (i)      within the scope of the jointly undertaken criminal activity,
      (ii)     in furtherance of that criminal activity, and
      (iii)    reasonably foreseeable in connection with that criminal activity.

U.S.S.G. § 1B1.3(a)(1)(B). Therefore, to establish that the court should consider the shooting of Pharoh Jackson in calculating Mr. Ward's offense level under the Guidelines, the Government needs to make two showings by a preponderance of the evidence: first, that Mr. Ward either personally shot Jackson, aided and abetted the shooting, or that it was reasonably foreseeable to Mr. Ward and was within the scope and in furtherance of the conspiracy that a co-conspirator would shoot Jackson, *id.* § 1B1.3(a); and second, that Mr. Ward had "specific intent to kill" Mr. Jackson at the time of the shooting, *Braxton v. United States*, 500 U.S. 344, 351 n.1 (1991); *United States v. Stroman*, 420 F. App'x 100, 105 (2d Cir. 2011) (explaining that for U.S.S.G. § 2A2.1(a)(2), the Guidelines provision for attempted murder, to apply, "the district court must have concluded, by a preponderance of the evidence, that [the defendant] actually attempted or intended to kill his victim."). As explained below, I find that the Government has made both of these showings and thus that I must count the attempted murder of Pharoh Jackson in calculating Mr. Ward's Guidelines range.

     The Government presented evidence at the January 2, 2019 *Fatico* hearing that Pharoh Jackson, a member of GSB's rival gang Slutwave, was shot from a car on September 16, 2015.[4]

---

[4]     While the Indictment charged a shooting "[o]n or about September 17, 2015," the evidence at the *Fatico* hearing suggested that the shooting occurred on September 16, 2015. Following the hearing, the Government's position is that the shooting occurred on September 16. Plea Agreement, ECF No. 444 at 7.

*Fatico* Tr., ECF No. 305 at 28. The Government's only witness at that hearing was Special

Agent Michael Sorrentino of the Bureau of Alcohol, Tobacco, Firearms, and Explosives, who

testified, based on an interview with Mr. Jackson, that "the shooting took place from inside the

vehicle, and that Dejuan Ward had shot at [Jackson] through the vehicle window." *Id.* at 59; *see*

*also* Grand Jury Tr., Gov't Ex. 118 at 10–13 (On July 19, 2017 Jackson testified to a Grand Jury

that "Hot Boi"—a name used by Ward—shot him when "I was riding my bike and he pulled up

on the side of me, he left one shot, hit me in my leg," and that "Hot Boi" was in the driver's seat

of a black, two-door car when he leaned over and shot at Jackson through the passenger side

window.). According to SA Sorrentino, Jackson was hit in the leg and did not report the shooting

at the time. *Fatico* Tr., ECF No. 305 at 52–53.

The Government introduced substantial circumstantial evidence—including over thirty

exhibits containing text messages, Facebook posts and messages, photos, and videos—tying Mr.

Ward to the shooting and showing his intent to kill Jackson. First, the Government produced

ample evidence that Mr. Ward had access to firearms and that he enjoyed showing them off. *See*

Gov't Ex. 84A (video of Mr. Ward posing with various firearms, including a revolver that

appeared to contain a round of ammunition, sent on April 27, 2016); Gov't Ex. 85 (text messages

from Mr. Ward stating "My pole loaded" and attaching a photograph of Mr. Ward holding a

firearm, sent April 29, 2016); Gov't Ex. 87A (a compilation of videos and photographs of Mr.

Ward posing with firearms, sent May 23, 2016)[5]; Gov't Ex. 109A (video of Mr. Ward posing

with a firearm, sent August 16, 2016).

---

[5]     On cross-examination, SA Sorrentino agreed that there was "no metadata connected to
[the video compilation] as to when either the images or the motion pictures were taken." *Fatico*
Tr., ECF No. 305 at 305–06. However, the compilation was attached to a text message sent on
May 23, 2016 from Mr. Ward to other members of GSB. Gov't Ex. 87. This evidence shows Mr.

Second, the evidence suggests that Mr. Ward had a motive to harm Pharoh Jackson since Jackson was a member of a rival gang, Slutwave, and had disrespected two deceased members of GSB or Piru, another gang allied with GSB. Guilty Plea, ECF No. 489 at 52 (Ward admitted that Piru and GSB were not rivals but were "on the same side."). Mr. Ward admitted during his change-of-plea colloquy on October 7, 2019 that he became a member of GSB in 2011, then became a member of Piru in February 2013, but remained an associate of GSB from February 2013 until his arrest. Guilty Plea Tr., ECF No. 489 at 49–50.[6] He explained that Slutwave was a rival group, and that GSB members and associates would discuss on Facebook shooting, fighting, or injuring rival gang members. *Id.* at 50–51; Plea Agreement, ECF No. 444 at 5 (stipulating that "Mr. Ward agreed with GSB members that members of rival groups, a.k.a., the opposition, including Slutwave and West Reade, who disrespected deceased or imprisoned GSB members and Piru allies were to be subjected to violence"). Pharoh Jackson also testified that

_____

Ward had access to several different types of firearms at least prior to May 23, 2016 and was eager to show them off.

[6]     Though Mr. Ward's post-hearing brief argued that he was not a GSB member at the time of Jackson's shooting, ECF No. 321 at 3, he appears to have abandoned that argument since. Plea Agreement, ECF No. 444 at 5 (stipulating that "Mr. Ward was an associate of GSB during the period of the charged RICO conspiracy," that "Mr. Ward agreed with GSB members that members of rival groups, a.k.a., the opposition, including Slutwave and West Reade, who disrespected deceased or imprisoned GSB members and Piru allies were to be subjected to violence," and that "Mr. Ward never withdrew from that agreement with GSB associates"). In any event, neither Ward's statements at his plea colloquy nor the evidence at the January 2, 2019 *Fatico* hearing suggest that there was a sharp distinction between "members" and "associates" of GSB, and RICO's recognition of "association-in-fact" enterprises makes any distinction between "members" and "associates" legally insignificant. *See Boyle v. United States*, 556 U.S. 938, 944–48 (2009) (The Court recognized that RICO enterprises may be "formal or informal," including "any union or group of individuals associated in fact. . . . [A]n association-in-fact enterprise is simply a continuing unit that functions with a common purpose. Such a group need not have a hierarchical structure . . . . Members of the group need not have fixed roles . . . . The group need not have a name, regular meetings, dues, established rules and regulations . . . .").

Slutwave and GSB "beef with each other"; that he had "made a song dissing" Shamar Willet, who was associated with GSB and was the older brother of Ward's co-defendants and fellow GSB members Clifford Brodie and Milton Westley; that he posted the song publicly on Facebook; that Milton Westley responded angrily to the post; and that he received threats that people would "shoot [him] up." Grand Jury Tr., Gov't Ex. 118 at 15–18. SA Sorrentino testified at the *Fatico* hearing that Jackson's rap song disrespected both Willet and Torrence Gamble, a/k/a "TJ," a member of Piru. *Fatico* Tr., ECF No. 305 at 34, 12.

The core of the Government's proof at the January 2, 2019 *Fatico* hearing was a series of Facebook posts and messages spanning a period of 15 months in which Mr. Ward elaborated on his motive for shooting Jackson, strongly suggested that he himself shot Jackson on September 16, 2015, and made statements suggesting intent to kill:

- On January 21, 2015, Mr. Ward sent a message to Jackson stating, "stop running pussy . . . If u ain't run where u go ? We [c]ircled DA block 4 times . . . let's see how this turn out." Gov't Ex. 3.

- On September 16, 2015, Jackson sent a message to a friend attaching a photo of a gunshot wound. Gov't Ex. 7 at 5. SA Sorrentino testified that the photograph was a "picture of the gunshot wound Pharoh Jackson sustained," which was consistent with the scarring on Mr. Jackson that SA Sorrentino later personally observed during an interview with Jackson in 2017. *Fatico* Tr., ECF No. 305 at 52, 59–60.[7]

- Also on September 16, 2015, Jackson exchanged messages with another friend, in which the friend asked, "Who did it," Jackson responded "Not over fb [Facebook],", and then Jackson added "Just kno hb." Gov't Ex. 8. Mr. Ward admitted that he used the nicknames "Hot Boi" and "HB." Guilty Plea Tr., ECF No. 489 at 6.

- On September 17, 2015, Mr. Ward exchanged messages with Pharoh Jackson:

    [Ward]:        U talking like I'm finished . . . I promise u next time I'm hopping
                   out

---

[7]     Mr. Ward argued in his post-hearing brief that these text messages are not persuasive evidence of Mr. Ward's involvement in the shooting since they were sent on September 16, 2015, "before the alleged date of the shooting of September 17, 2015." ECF No. 321 at 8. As discussed above, the evidence suggests that the shooting in fact occurred on September 16, 2015.

. . .

| | |
|---|---|
| [Jackson]: | I like yu aim a lil yu fucked my shit up |
| [Ward]: | What got fucked up and just so happen wen I see u I was rolling on a zan |
| [Jackson]: | leg but why yu be looking fa me |
| [Ward]: | Da leg I got no respect smh [shaking my head] .. And everybody thought it was a joke tJ was playboy he was with us and yu disrespected my man so …. |

. . .

| | |
|---|---|
| [Jackson]: | Ight now I know but I don't appreciate u doin that |

. . .

| | |
|---|---|
| [Ward]: | u thought I'm done? |

Gov't Ex. 9 at 2. SA Sorrentino testified that he believed "rolling on a zan" referred to being high on Xanax, a narcotic. *Fatico* Tr., ECF No. 305 at 60. He believed that Mr. Ward's statement "yu disrespected my man so…" referred to TJ, whom Mr. Jackson had previously disrespected. *Id.* at 61.

- On the same day, September 17, Mr. Ward sent a screenshot of his conversation with Jackson to a friend, stating, "Ima finish the job." Gov't Ex. 10A at 1. The friend responded, "its only right bro, that nikka disrespected somethn crazy a couple times," and "smh [shaking my head] nikkas really be tryna get they clout up by disrespectin." *Id.* Mr. Ward wrote back, "Facts. And the one time I catch him the bs happened," to which his friend replied, "It's like God be savin these nikkas." *Id.*

- Also on September 17, Mr. Ward posted on Facebook stating, "Disrespect tJ u get kilt the same day lil mark n shadell they got kilt the same way." Gov't Ex. 10. SA Sorrentino testified that "tJ" referred to Torrence Gamble, that Mr. Ward's post was a reference to a rap lyric, and that Mr. Ward had "subbed out the actual name in the lyric to TJ." *Fatico* Tr., ECF No. 305 at 64.

- On September 22, 2015, Mr. Ward sent a Facebook message to a rival stating, "Ima see u b4 u see me ask nore."Gov't Ex. 11 at 1. SA Sorrentino testified that "nore" was a nickname for Pharoh Jackson, *Fatico* Tr., ECF No. 305 at 67, and the Facebook messages associated with Mr. Jackson confirm this, *see, e.g.*, Gov't Exs. 3, 7. Mr. Ward then sent this rival the screenshot of his September 17 conversation with Mr. Jackson.

- On March 1, 2016, Mr. Ward sent a Facebook message to Pharoh Jackson stating, "I just found out some shot that just saved ya life u a real nikka kf u ain't fold up n snitch on me." Gov't Ex. 46.[8] SA Sorrentino testified that in late February or early March 2016, New Haven police officers went to Mr. Ward's house and spoke to him about gang violence, to show that law enforcement "knew what was going on, that there was gang

---

[8]      SA Sorrentino testified that, based on his review of a large volume of Facebook and other messages in the case, he interpreted "kf" to stand for "can't front," meaning "I can't lie" or "to be honest." *Fatico* Tr., ECF No. 305 at 75.

violence happening." *Fatico* Tr., ECF No. 305 at 73–74. In response to Ward's message, Jackson wrote, "You should've knew I wasn't gunna tell." Gov't Ex. 46. Ward replied, "I ain't even kno they knew it was me but u ain't no . . . Rat." *Id.*

- On April 5, 2016, Clifford Brodie, Mr. Ward's co-defendant and fellow GSB member, posted on Facebook, "for all u bitches talking bout 'professional leg shooters' don't cry if yu fuck around n katch one too." Gov't Ex. 73 at 1. SA Sorrentino testified that James Harris was shot in the leg two days prior, on April 3, 2016. *Fatico* Tr., ECF No. 305 at 83. About 20 minutes after Brodie's April 5 post, Mr. Ward posted on Facebook, "I ain't never aim for the leg we was taught better than that I slipped once," and tagged Clifford Brodie. Gov't Ex. 74 at 1.

Taken together, these posts and messages suggest that Mr. Ward personally shot Pharoh Jackson on September 16, 2015, that the shooting was in furtherance of GSB's conspiracy, and that he intended to kill Jackson. To begin with, the messages suggest that Ward was hunting Jackson, Gov't Ex. 3 ("stop running pussy . . . We [c]ircled DA block 4 times . . . let's see how this turn out"); Gov't Ex. 10A ("And the one time I catch him the bs happened."), and bolster Jackson's testimony to the Grand Jury that Mr. Ward wanted to shoot him in retaliation for disrespecting TJ, a member of Piru. Grand Jury Tr., Gov't Ex. 118 at 14–18, 21–22 (Jackson testifying that he had been warned before the shooting that someone would go after him for "wording on" GSB associates such as Shamar Willet, and that he had also disrespected TJ); Gov't Ex. 9 ("And everybody thought it was a joke tJ was playboy he was with us and yu disrespected my man so …."); Gov't Ex. 10A at 1 ("its only right bro, that nikka disrespected somethn crazy a couple times."); Gov't Ex. 10 ("Disrespect tJ u get kilt the same day."); *see also Fatico* Tr., ECF No. 305 at 31 (SA Sorrentino testified that TJ was a member of Piru.). This evidence—along with Mr. Ward's stipulation that he had agreed with GSB members that rivals who disrespected "GSB members and Piru allies were to be subjected to violence," Plea Agreement, ECF No. 444 at 5—also shows that the shooting was committed in furtherance of the GSB conspiracy.

The messages exchanged around the time of the shooting also indicate that Mr. Ward was the shooter: Jackson says that Ward shot him, Gov't Ex. 8 ("Just kno hb"); Gov't Ex. 9 at 1 ("I like yu aim a lil u fucked my shit up"), and Ward seems to take credit for the shooting in his messages both with Jackson, Gov't Ex. 9 at 1–2 ("[W]en I see u I was rolling on a zan . . . Da leg I got no respect . . . u thought I'm done?"); Gov't Ex. 46 ("u a real nikka kf u ain't fold up n snitch on me . . . I ain't even kno they knew it was me"), and with others, Gov't Ex. 10A at 1 ("Ima finish the job"); Gov't Ex. 11 at 1 ("Ima see u b4 u see me ask nore"). Mr. Ward makes no mention of any other person being involved in the shooting, referring only to himself. Gov't Ex. 9.[9] Finally, Mr. Ward's messages suggest that he intended to kill Jackson: he had been hunting Jackson, he was motivated to retaliate against Jackson for disrespecting TJ, he suggests that hitting Jackson's leg was a mistake, and he states his intent to try again to kill Jackson. Gov't Ex. 9 at 2 ("U talking like I'm finished . . . I promise u next time I'm hopping out. . . . u thought I'm done?); Gov't Ex. 10A ("Ima finish the job . . . And the one time I catch him the bs happened," to which Ward's friend replied, "It's like God be savin these nikkas"); Gov't Ex. 10 ("Disrespect tJ u get kilt the same day"); Gov't Ex. 74 ("I ain't never aim for the leg we was taught better than that I slipped once").

These posts and messages corroborate Jackson's statements in his interview with New Haven Police and ATF personnel on March 9, 2017 and his testimony before the Grand Jury on July 19, 2017. Both times, Jackson stated that Mr. Ward ("Hot Boi") shot at him from a vehicle, and that he was hit in the leg. *See* ECF No. 103-1 at 10–12; Gov't Ex. 118 at 12. Jackson gave

---

[9]     In his first change-of-plea colloquy, which resulted in a guilty plea that was subsequently vacated, Ward testified that he was present and armed at the shooting of Pharoh Jackson and knew it was going to happen, but that he himself was not the shooter. 2018 Guilty Plea Tr., ECF No. 295 at 61–63, 66.

contradictory statements, however, when interviewed by Mr. Ward's counsel and investigator on April 5, 2018. *Fatico* Tr., ECF No. 305 at 238; Def. Ex. 10 (investigator's summary of the interview with Mr. Jackson). The Government did not call Mr. Jackson as a witness at the *Fatico* hearing, and I had no opportunity to observe his demeanor, hear his explanation of events, or ask him to clarify apparent inconsistencies in his various statements. Because of the inconsistencies, Jackson's Grand Jury testimony alone would not convince me to find that Mr. Ward committed the shooting. But, as discussed above, there is sufficient independent evidence—in Facebook messages, text messages, photos, and videos—to support a finding by a preponderance of the evidence that Mr. Ward shot Mr. Jackson. The electronic communications confirm that Jackson told the Grand Jury the truth.

The evidence introduced at the *Fatico* hearing also distinguishes this case from *United States v. Stroman* because it provides sufficient proof that Mr. Ward shot Jackson with intent to kill. In *Stroman*, the Second Circuit held that deliberately shooting at a person from some distance is not, by itself, sufficient evidence of a specific intent to kill. 420 F. App'x at 105 (finding that "running into [a] bodega for the very specific purpose of shooting whoever it was [the defendant] was aiming his gun at" did not "directly address whether [the defendant] intended to kill his victim," and that the district court's finding that it "look[ed] like" the defendant was "attempt[ing] to kill someone" was not sufficient to support a finding of specific intent to kill). Though Mr. Ward shot Jackson from across the passenger seat while inside a vehicle, which was not extremely close range, there is far more background evidence of intent here than in *Stroman*, where the court did not discuss motive or whether the defendant even knew the victims. *See United States v. Stroman*, 498 F. App'x 67, 69–70 (2d Cir. 2012)

(affirming the district court's finding of specific intent to kill, after remand, based on the scene "dramatically captured on the screen of the grocery's video camera").

Other cases have found that the defendant committed attempted murder when the defendant shot from some distance but there was other evidence of planning or malice. *E.g. United States v. Rodriguez*, 738 F. App'x 729 (2d Cir. 2018) (finding specific intent to kill when defendant "wait[ed] for a specific vehicle to approach from down the street" and then "fir[ed] four shots into the vehicle at close range"); *United States v. Wade*, No. 18-4838, 2019 WL 3072696, at *1 (4th Cir. July 12, 2019) (approving application of § 2A2.1 when defendant was in an argument with a woman, struck her with his gun, and then shot at least 10 rounds at her departing vehicle when she attempted to flee); *United States v. Chambers*, 719 F. App'x 246, 248 (4th Cir. 2018) (approving application of § 2A2.1 when defendant drove by a man he had previously fought with at a club, returned to the victim's location, and shot at the victim, hitting him in the left calf); *United States v. Rios*, 830 F.3d 403, 441 (6th Cir. 2016) (approving application of § 2A2.1 where the defendant viciously beat a victim who had stolen cocaine from the defendant's co-conspirator because "there was significant evidence of prior planning by [the defendant]"). The electronic communications summarized above provide a window into Mr. Ward's mind, offering an even clearer picture of intent to kill than the evidence in these cases.

Finally, while there is some evidence that Mr. Ward may have been intoxicated at the time of the shooting, *see* Gov't Ex. 9 at 2 ("just so happen wen I see u I was rolling on a zan"); *Fatico* Tr., ECF No. 305 at 60 (SA Sorrentino explaining that "rolling on a zan" referred to being high on Xanax, a narcotic), I find that this passing reference is insufficient to negate the other evidence of specific intent. Courts have recognized that even voluntary intoxication can at times preclude a finding of specific intent. *See United States v. Rahman*, 189 F.3d 88, 142 & n.18 (2d

Cir. 1999) (approving a jury instruction that "intoxication may, under some circumstances, negate the existence of the defendant's intent to commit the crime . . . . If you find that defendant was intoxicated throughout the entire course of his alleged participation in the crimes charged, you may conclude that the defendant did not have the required intent that I described earlier."); *United States v. Darby*, 37 F.3d 1059, 1064 (4th Cir. 1994) ("[D]efenses such as diminished mental capacity and voluntary intoxication are viable only for specific intent crimes, because such defenses directly negate the required intent element of those crimes"). Here, the only evidence of intoxication is Mr. Ward's statement that he was "rolling on a zan"; there is no other evidence to suggest that Mr. Ward was incapable on September 16, 2015 of forming specific intent to kill. In fact, the evidence suggests that Mr. Ward formed the intent to kill Jackson *before* the evening of the shooting: Mr. Ward had a preexisting grudge against Jackson, had been hunting him since at least January 2015, and acted consistently with that grudge when he pulled the trigger. *See* Gov't Ex. 3. And although the mention of a "zan" raises the possibility of intoxication, it could just as easily have been one rival gang member's fabricated excuse to another about why his aim was not true. In any event, it is insufficient to negate the specific intent demonstrated by a preponderance of the evidence as a whole.

Based on the evidence presented at the *Fatico* hearing and Mr. Ward's admissions in the Plea Agreement and at the October 7, 2019 colloquy, I find that Mr. Ward shot Pharoh Jackson, in furtherance of his racketeering conspiracy with other GSB members, with specific intent to kill. These findings of fact support considering attempted murder as a fourth underlying racketeering act under U.S.S.G. §§ 2E1.1 and 2A2.1.

**B. March 2016 Obstruction of Justice regarding James Harris**

The parties' other dispute regarding Mr. Ward's Guidelines calculation relates to an allegation of obstruction of justice in March 2016. The Government argues that Mr. Ward's March 22, 2016 Facebook post stating, "Let's not forg[e]t about jizz [James Harris] snitching that mans in new haven Just Kicking it like a kick stand," Gov't Ex. 47, constituted obstruction of justice because it was posted with intent to retaliate against James Harris for having spoken to federal law enforcement officers, in violation of 18 U.S.C. § 1513. ECF No. 478 at 2; *Fatico* Tr., ECF No. 305 at 78 (SA Sorrentino explained that "Jizz" refers to James Harris.) Mr. Ward does not agree that this fifth act satisfies the requirements of § 1513 and argues it thus should not be used in his Guidelines calculation. *Id.* at 8.

In his plea agreement, Mr. Ward admitted that he committed obstruction of justice with regard to James Harris on July 1, 2015 when Ward posted on Facebook an article from the *New Haven Register* about Tyhitt Bember, a member of Piru, pleading guilty to a shooting. Plea Agreement, ECF No. 444 at 5–6; Gov't Ex. 4 at 1; *Fatico* Tr., ECF No. 305 at 48–49 (explaining that Tyhitt Bember, a/k/a Tyger Ru, shot James Harris). In the thread of comments on the post, Mr. Ward accused James Harris—whom Mr. Ward understood to be the victim of the shooting but who was unidentified in the *Register* article—of cooperating with federal and state authorities in their investigation and prosecution of Bember. Gov't Ex. 4 ("U a fucking rat. U n ya mother was going to kourt."); Plea Agreement, ECF No. 444 at 5–6 (Mr. Ward stipulated that he "posted on Facebook a New Haven Register article about [Bember] who he knew was the subject of a federal investigation, and suggesting that James Harris had cooperated with federal and state authorities thereby leading to the Piru member's conviction."). Mr. Ward admitted that he posted the article publicly and publicly called Mr. Harris a "rat" on Facebook "[t]o show

16

everybody that he [Harris] cooperated," intending to share the information with both GSB members and others, and that he understood that posting the information would lead people to want to retaliate against Mr. Harris. Guilty Plea Tr., ECF No. 489 at 58; *see also id.* at 61 (Mr. Ward clarified that he did not necessarily intend for Mr. Harris to get shot, "[j]ust beat up, anything. . . . Exile."). He admitted that this July 2015 Facebook post amounted to obstruction of justice and that this constituted a RICO predicate act.[10]

The parties' dispute relates to a second Facebook post from March 22, 2016. The Government contends that Mr. Ward retaliated against James Harris in March 2016 when he posted on Facebook, "Let's not forget about jizz [Harris] snitching that mans in new haven Just Kicking It like a kick stand." Gov't Ex. 47 at 1. Harris was shot (a second time) on April 3, 2016, and he refused to cooperate with any federal investigation thereafter. Plea Agreement, ECF No. 444 at 5. The Government originally argued at the October 7, 2019 change-of-plea hearing that Mr. Ward's March 2016 Facebook post, like the July 2015 post, violated the "catch-all" provision of 18 U.S.C. § 1503. In an October 22, 2019 Order, I noted that to convict under the catch-all or "omnibus" provision of § 1503, the Government needed to show, *inter alia*, "that there is a pending judicial or grand jury proceeding constituting the administration of justice," and "that the defendant knew or had notice of the proceeding." ECF No. 461 (citing *United States v. Quattrone*, 441 F.3d 153, 170 (2d Cir. 2006)). I ordered the Government to explain whether there was any such pending proceeding of which Mr. Ward was aware in March 2016;

---

[10] At Mr. Ward's change-of-plea hearing, the Government stated that this July 2015 conduct violated the "catch-all" provision of 18 U.S.C. § 1503, criminalizing acts that "corruptly . . . influence[], obstruct[], or impede[] . . . the due administration of justice." § 1503(a). Defense counsel did not disagree. Guilty Plea Tr., ECF No. 489 at 15–18; *see also* Def.'s Objection, ECF No. 490 at 6 n.3 (agreeing that the July 1, 2015 post "met the bare minimum requirements for obstruction of justice under § 1503").

the Government answered in the negative. ECF No. 478 at 1 ("The short answer to the Court's question is no."). Mr. Ward cannot, therefore, be held responsible for violating § 1503 in March 2016. But the Government also revised its argument regarding the fifth underlying act to argue that the March 2016 Facebook posting violated 18 U.S.C. § 1513. ECF. No. 478 at 2. Both §§ 1503 and 1513 qualify as RICO predicate acts. 18 U.S.C. § 1961(1).

Section 1513 criminalizes retaliation against a witness, victim, or informant. Specifically, the statute states:

> Whoever knowingly engages in any conduct and thereby causes bodily injury to another person . . . or threatens to do so, with intent to retaliate against any person for— . . . (2) any information relating to the commission or possible commission of a Federal offense . . . given by a person to a law enforcement officer; or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both.

15 U.S.C. § 1513(b)(2). As used in this section, "the term 'law enforcement officer' means an officer or employee of the Federal Government" who is "authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense." 18 U.S.C. § 1515(a)(4)(A). "[T]o sustain a witness retaliation charge, the government must establish three elements: One, the defendant engaged in conduct that caused or threatened a witness with bodily injury; two, the defendant acted knowingly, with the specific intent to retaliate against the witness for information the witness divulged to law enforcement authorities about a federal offense; and three, the officials to which the witness divulged information were federal agents." *United States v. Draper*, 553 F.3d 174, 180 (2d Cir. 2009).

**1)   *Mr. Ward "threatened a witness with bodily injury."***

Because the "conduct" at issue in this case is a message posted on Facebook, Mr. Ward's First Amendment interests are implicated. "True threats," however, "are not protected by the First Amendment." *United States v. Koschuk*, 480 F. App'x 616, 617 (2d Cir. 2012) (upholding

18

conviction under § 1513(b) based on a true threat). "True threats encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. The speaker need not actually intend to carry out the threat." *Virginia v. Black*, 538 U.S. 343, 359–60 (2003) (internal quotation marks and citations omitted); *see also id.* at 360 (finding that implicit threats—*i.e.*, cross burning—can constitute a true threat since "the history of cross burning in this country shows that cross burning is often intimidating, intended to create a pervasive fear in victims that they are a target of violence"). In the Second Circuit, the "test for whether conduct amounts to a true threat is an objective one—namely, whether an ordinary, reasonable recipient who is familiar with the context of the [communication] would interpret it as a threat of injury." *United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (alteration in original).[11]

Mr. Ward argues that the Government has not shown that the March 22, 2016 Facebook post constituted "conduct" that "thereby cause[d] bodily injury to another person" or that it

---

[11]    In *Elonis v. United States*, 135 S. Ct. 2001 (2015), the Supreme Court held that a different statute criminalizing threats, 18 U.S.C. § 875(c), required proof both that a reasonable person would regard the communication as a threat and that the defendant was *aware* of the threatening nature of the communication when he transmitted it, even though the statute did not expressly include the latter *mens rea* requirement. Such a reading of the statute was necessary, the Court found, to square the statute with the "conventional requirement for criminal conduct—*awareness* of some wrongdoing." 135 S. Ct. at 2011 (emphasis in original).
        Unlike the statute at issue in *Elonis*, 18 U.S.C. § 1513(b) does include explicit *mens rea* requirements, establishing criminal liability for anyone who "*knowingly* engages in any conduct . . . or threatens to do so, with *intent to retaliate* against any person" (emphasis added). The Second Circuit has interpreted § 1513 to require proof that the defendant "meant his words as threats," *United States v. Amor*, 24 F.3d 432, 436 (2d Cir. 1994) (upholding conviction under § 1513 because "[t]he evidence was ample to permit a rational juror to find beyond a reasonable doubt that [the defendant] meant his words as threats and that they were so perceived"), which is similar to the requirement set forth in *Elonis* that the defendant know the threatening nature of his communication when he transmits it. The evidence at the *Fatico* hearing easily satisfies this standard. As explained in the text, everyone who saw the Facebook posts, including Ward, understood them to designate Harris as a target for violent retribution.

threatened such injury. Def.'s Objection, ECF No. 490 at 3. I disagree. The evidence shows that GSB members participated in the April 3, 2016 shooting of James and Donald Harris, *see, e.g.*, November 28, 2018 *Fatico* Tr., ECF No. 304 at 64–65 (discussing the ballistics evidence linking GSB to the shooting), and the temporal proximity of Ward's March 22 post to the shooting creates at least a reasonable inference of causation. I need not definitively resolve the issue of causation, however, because Ward's post was, at the least, a true threat to cause bodily injury to Harris. The evidence the Government presented, particularly the many Facebook posts and messages, provide important context for Mr. Ward's March 22, 2016 post and show both that Mr. Ward "mean[t] to communicate a serious expression of intent to commit"—or have someone else commit—"an act of unlawful violence," *Black*, 538 U.S. at 359–60, and that an "ordinary, reasonable recipient familiar with the context of the [March 22 post] would interpret it as a threat of injury." *Turner*, 720 F.3d at 420.

First, Mr. Ward's communications on Facebook and his own admissions in his plea agreement and change-of-plea colloquy show that he believed "snitching" warranted violent retribution and that he meant his March 22, 2016 post to communicate to Harris a threat of injury. On March 1, 2016, after law enforcement officers spoke to him about gang violence, Mr. Ward sent Pharoh Jackson a message, "I just found out some shot that just saved ya life u a real nikka kf u ain't fold up n snitch on me," suggesting that Mr. Ward would have injured or killed Jackson if had Jackson "fold[ed] up n snitch[ed] on [Ward]." Gov't Ex. 46. In his Plea Agreement, Mr. Ward stipulates that he "agreed with GSB members that members of rival groups . . . who disrespected deceased or imprisoned GSB members and Piru allies were to be subjected to violence." ECF No. 444 at 5. When he posted the *New Haven Register* article on July 1, 2015 regarding the prosecution of Tyhitt Bember, a member of Piru, Mr. Ward "knew

that the public outing of Mr. Harris' role in the investigation would lead to retaliation." *Id.* At his change-of-plea colloquy, Mr. Ward admitted that he posted the article publicly "[t]o show everybody that [Harris] cooperated" and that he "underst[oo]d putting that information out publicly would lead people to want to retaliate against Mr. Harris." Guilty Plea Tr., ECF No. 489 at 58–59; *see also id.* at 61 (Mr. Ward clarified, "And, um, when I said retaliation, not necessarily for him to get shot. Just beat up, anything. . . . Exile."). Finally, after Mr. Harris was shot on April 3, 2016, Mr. Ward posted on Facebook the same day, "That's what his snitch ass get hope his ass got smoked free," and tagged "Tyger Ru," the nickname for Bember. Gov't Ex. 49; *see Fatico* Tr., ECF No. 305 at 80. In other Facebook messages shortly after that April 3 post, Mr. Ward confirmed he was referring to James Harris, whom he viewed as a "snitch":

| | |
|---|---|
| Michael Ritter: | Who you talking bout bro what happened |
| Dejuan Ward: | Lil nikka jiz |
| | From the r told on tyger |
| Michael Ritter: | That's who got shot on the ave |
| Dejuan Ward: | Yeah |

Gov't Ex. 50. This evidence shows that Mr. Ward believed "snitches" deserved injury in retribution and that he knew that calling Harris a "snitch" would lead people to want to retaliate against Harris; indeed, as discussed below, many of the commenters on Ward's July 1, 2015 and March 22, 2016 posts understood those posts to label Harris as someone to be attacked or retaliated against. Ward's statement of his beliefs concerning "snitches," and concerning Harris in particular, is also probative of his intent to retaliate in making the March 22, 2016 posting.[12]

---

[12]     Contrary to suggestions in Mr. Ward's post-hearing brief, ECF No. 321 at 15–16, the Court's reliance on Mr. Ward's statements of opinion concerning "snitches" does not violate the First Amendment because, as the defendant acknowledges, the First Amendment does not prohibit the use of speech to establish the elements of a crime, such as 18 U.S.C. § 1513. In any event, Ward's opinion concerning snitches is not an "abstract belief[]," ECF No. 321 at 16, and his expression of that opinion, whatever other message it might convey, constitutes an unprotected "true threat" in the context in which it was made.

In addition, the evidence suggests that an "ordinary, reasonable recipient familiar with the context of the [March 22 post] would interpret it as a threat of injury." *Turner*, 720 F.3d at 420. GSB had a history of and a reputation for violence, particularly against anyone whom GSB perceived as disrespectful or as cooperating with law enforcement. And Mr. Ward made other Facebook posts attacking those he viewed as "snitches" prior to March 2016, in connection with GSB shootings. For instance, on February 7, 2016, one day after Damien Smith, a rival of GSB, was shot by GSB members, Mr. Ward posted a Facebook status saying "Ya broke mfs really be getting allowances from the police to tell on ya brother get yo ass a job broke boi and keep ya mouth shut." Gov't Ex. 45A; *Fatico* Tr., January 2, 2019, ECF No. 305 at 71–72. Special Agent Sorrentino testified that he believed this post was made in response to the shooting of Damien Smith. *Fatico* Tr., ECF No. 305, at 71–72, 199. On September 17, 2015, one day after he shot Pharoh Jackson, Mr. Ward posted on Facebook, "Disrespect tJ u get kilt the same day." Gov't Ex. 10. Ward's Facebook posts were tied to real GSB violence.

In addition, the July 1, 2015 Facebook post—which Mr. Ward admits constituted obstruction of justice—suggests that Harris himself viewed Ward's Facebook posts as a threat. Even though the *New Haven Register* article did not name James Harris, other users commenting on Ward's post understood the "victim" referenced in the article to be Harris. Gov't Ex. 4 at 2 (One comment asked, "Where jizz [Harris] name at?", to which another comment replied, "Niggas Already Know He Told So It Doesn't Matter Where His Name At In The Article."). Harris himself responded, stating, "This whole shit fooled whoever think im snitchin kould eat a dick." *Id.* Ward then wrote, "U a fucking rat. U n ya mother was going to kourt"; Harris again denied it, stating "ya [c]razy af [as fuck]." *Id.* at 2–3. A few hours later, Ward posted the screenshot again, tagged James Harris, and wrote "u rat ass Nikka." Gov't Ex. 6 at 1. The fact

that Harris commented twice on the post to deny "snitching" suggests he viewed the accusation as serious and, it is reasonable to infer, dangerous.

And the remarks of other commenters make clear that they understood Ward's messages, in context, to communicate that Harris (and/or possibly his family members) would be injured or killed. For example, one comment tagged Tyger Ru (Bember) and stated, "Free my cuz . . . fuck these snitches ur family gonna handle cuz we got the names." *Id.* at 2–3. Other commenters stated, "Omg HotBoy Chill," and "shyt jus got real," suggesting they too thought Ward's post was inciting violence.

Finally, the comments on the March 22, 2016 post likewise suggest that recipients viewed it as a threat. After Mr. Ward posted, "Let's not forgot about jizz snitching," another user commented, "Don't start HB," again suggesting that recipients saw Ward's post as provocative. Gov't Ex. 47 at 1. Another user commented, "I SAID to jizz it's [] JUST a status and he said he still alive and niggas not doing nothing," suggesting that she and Harris had discussed whether Ward's post constituted a threat or whether Ward just "want[ed] attention." *Id.* at 3. The fact that recipients even had this discussion shows that they believed Ward's post could be a real threat of harm or even death.

Given all this context—the history of Facebook posts and GSB's history of shootings prior to March 22, 2016—the preponderance of the evidence shows that Mr. Ward's March 22 Facebook post was meant to be intimidating and to instill fear in Mr. Harris, and that an "ordinary, reasonable recipient familiar with the context of the [post] would interpret it as a threat of injury." *Turner*, 720 F.3d at 420. I find that Mr. Ward's post was a true threat of bodily injury to Harris. Ward meant it that way, and others received it that way.

## 2) *Mr. Ward acted with specific intent to retaliate.*

Mr. Ward also argues that the Government failed to prove the requisite *mens rea* under §
1513 because it failed to show "specific intent to retaliate against Harris for cooperating in a
federal investigation." Def.'s Objection, ECF No. 490 at 5. But based on the evidence, I find that
Mr. Ward did have specific intent to retaliate against Harris for giving information relating to the
commission of a federal offense to federal law enforcement officers. First, Mr. Ward stipulated
in his Plea Agreement that he "knew [Tyhitt Bember] was the subject of a federal investigation"
and that the *New Haven Register* article "suggest[ed] that James Harris had cooperated with
federal and state authorities" regarding Bember's prosecution. Plea Agmt., ECF No. 444 at 5. At
his change-of-plea hearing, he admitted that he posted the *Register* article "[b]ecause [he] wanted
to let people know [Harris] was cooperating with the Government." Guilty Plea Tr., ECF No.
489 at 59. Mr. Ward has thus admitted that he knew, by July 2015, that Harris had given federal
authorities information related to a federal criminal investigation against Bember.[13] While there

---

[13]     Mr. Ward argues in his brief that "[n]o evidence is presented that Bember perpetrated –
or was investigated for – a federal crime; let alone that Harris gave 'information relating to . . .
[a] Federal offense" pursuant to Section 1513(b)(2)," making it "impossible for Mr. Ward to
possess the requisite intent to 'retaliate' against Harris for cooperating as a witness to a *federal*
crime." ECF No. 490 at 3. This argument ignores the stipulation in the Plea Agreement: Mr.
Ward explicitly admits that he "knew [Bember] was the subject of a federal investigation" and
that Ward's July 1, 2015 post "suggest[ed] that James Harris had cooperated with federal and
state authorities." ECF No. 444 at 5. While there is no evidence that Ward knew precisely what
Harris told federal authorities, the evidence shows that Ward believed Harris fingered Bember as
the person who shot him. Such information easily "relat[es] to the commission or *possible*
commission of a Federal offense," 18 U.S.C. § 1513(b)(2) (emphasis added), including, for
example, a firearms offense in violation of 18 U.S.C. § 924. *See United States v. Harris*, Nos.
90-6344, 90-6345, 90-6349, 1991 WL 165586 (6th Cir. Aug. 27, 1991) (recognizing the
"expansive language" of § 1513 to include information such as the "location of a suspected
felon," and finding that such a reading "is supported by the legislative history, which indicates
that the statute was designed to provide broad protections for witnesses, victims, and
informants"); *see also United States v. Mack*, No. 3:13-CR-00054 (MPS), 2016 WL 4373695, at
*6 (D. Conn. Aug. 15, 2016) (interpreting identical language in § 1512 and noting that "[c]ourts
have given broad sweep to the phrase 'relating to.' The addition of the phrase 'possible

is no evidence Mr. Ward knew of any additional cooperation between Mr. Harris and the federal government since July 2015, he did know at least of cooperation prior to July 2015.

Given this knowledge, the evidence suggests that Mr. Ward wrote the March 2016 post with intent to retaliate against Mr. Harris for cooperating with the federal government in relation to a federal investigation of Bember. As discussed above, Mr. Ward posted on April 3, 2016, the day Harris was shot, "That's what his snitch ass get hope his ass got smoked free," and tagged "Tyger Ru," the nickname for Bember. Gov't Ex. 49; *see Fatico* Tr., ECF No. 305 at 80; *see also* Gov't Ex. 50 (confirming that Ward was referring to "Lil nikka jiz," who "told on tyger" and "got shot on the ave"). These posts—calling Mr. Harris a "snitch" and referring twice to Bember—suggest that Mr. Ward's motivation for the March 2016 Facebook post was similar to the motivation behind the July 2015 Facebook post—*i.e.*, to retaliate against Mr. Harris for giving federal law enforcement information regarding the federal investigation against Bember.

### 3) *Harris divulged information to federal agents.*

Under *Draper*, the Government also must prove that "the officials to which [Mr. Harris] divulged information were federal agents." 553 F.3d at 180. The Government points to Facebook posts by co-defendant and GSB member Michael Via on April 24, 2016 attaching photos of an arrest warrant affidavit that refers to a May 13, 2013 meeting between Harris, Assistant U.S.

---

commission of a Federal offense' further enlarges the category of communications covered."); *United States v. Baldyga*, 233 F.3d 674, 681 (1st Cir. 2000) (Emphasizing "*possible commission* of a Federal offense" language in § 1512, the court found that "the dispositive issue is the federal character of the investigation, not guilty verdicts on any federal offenses that may be charged."); *United States v. Bailey*, 405 F.3d 102, 109 n.3 (1st Cir. 2005) ("Of course the statute [§ 1512] does not require that the defendant specifically know that the underlying conduct could constitute a federal offense.").

I find that Mr. Ward's knowledge that Bember was "the subject of a federal investigation" is sufficient to support a finding that Ward believed Harris provided information "relating to the . . . possible commission of a Federal offense" and that he intended to retaliate against Harris for this reason.

Attorney Peter Markle, and others at the U.S. Attorney's Office. Gov't Response, ECF No. 478 at 4; Gov't Ex. 78. While I agree with Mr. Ward that this April 2016 post does not show that Mr. Ward had any knowledge of the arrest warrant affidavit at the time of his March 22, 2016 post, the April 2016 post shows that Mr. Harris did, in fact, provide information to AUSA Markle, a "law enforcement officer" within the meaning of § 1513. *See* 18 U.S.C. § 1515(a)(4)(A) ("As used in sections 1512 and 1513 of this title, . . . the term 'law enforcement officer' means an officer of employee of the Federal Government . . . authorized under law to engage in or supervise the . . . prosecution of an offense."). This evidence confirms the accuracy of Mr. Ward's belief that Mr. Harris had cooperated with federal law enforcement officers—a belief Ward held as early as July 1, 2015, and of which he reminded others in his March 22, 2016 Facebook post. *See* Plea Agreement, ECF No. 444 at 5 (stipulating that on July 1, 2015, Ward posted an article about Bember, "who [Ward] knew was the subject of a federal investigation and suggesting that James Harris had cooperated with federal and state authorities thereby leading to [Bember's] conviction"); *see also* Gov't Ex. 78 at 4 (screenshot, posted on Facebook on April 24, 2016 by co-defendant Via, of an arrest warrant affidavit that stated, "On 5/13/13, I met with Assistant U.S. Attorney Markel [sic] and Investigator Grady at the US Attorney's Office. During this meeting, we met with James Harris *and his mother*." (emphasis added)); Gov't Ex. 4 at 2 (Ward commenting on his own July 1, 2015 post, responding to Harris's denial that he was cooperating by stating, "U a fucking rat. *U n ya mother* was going to kourt." (emphasis added)).

The Government has shown by a preponderance of the evidence that Mr. Ward "engaged in conduct that caused or threatened [Mr. Harris] with bodily injury," that Mr. Ward "acted knowingly, with the specific intent to retaliate against [Mr. Harris] for information [Harris] divulged to federal law enforcement about [the possible commission of] a federal offense," and

that "the officials to which [Mr. Harris] divulged information were federal agents." *Draper*, 553 F.3d at 180. These findings of fact support considering obstruction of justice in violation of 18 U.S.C. § 1513 with respect to his March 22, 2016 Facebook post as a fifth underlying racketeering act under U.S.S.G. §§ 2E1.1 and 2A2.1.

## IV.     CONCLUSION

Based on the findings of fact set forth above, I find that Mr. Ward may be held responsible under the Sentencing Guidelines for two additional underlying racketeering acts: the attempted murder of Pharoh Jackson and obstruction of justice on March 22, 2016.

_____/s/_____
Michael P. Shea, U.S.D.J.

Dated:          Hartford, Connecticut
                November 22, 2019